Brian Beauregard
27 GH Carter Drive
Danville, NH 03819
(603) 347-5664
brianb12310@gmail.com

*Plaintiff Pro Se*

U.S. DISTRICT COURT
DISTRICT OF NH

2019 FEB -4 AM 11:28

FILED

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BRIAN BEAUREGARD, an individual;<br><br>Plaintiff,<br><br>v.<br><br>RUSHMORE LOAN MANAGEMENT SERVICES LLC, a Delaware Limited Liability Company; and DOES 1 through 10, INCLUSIVE,<br><br>Defendant(s). | Case No. _____<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff Brian Beauregard (hereinafter "Plaintiff") *pro se*, and for his complaint against Defendant Rushmore Loan Management Services, LLC, (hereinafter "Rushmore" or "Defendant") complains as follows:

### JURISDICTION AND VENUE

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the action is between parties that are citizens of different states and the amount in controversy is greater than $75,000.

1

2. Venue is proper in this Court pursuant to 28 U.S.C. 1391 inasmuch as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and Plaintiff resides in this District.

## PARTIES

3. Plaintiff is an individual residing at 27 GH Carter Drive Danville, New Hampshire 03819 (hereinafter the "Subject Property") in county of Rockingham.

4. At all times herein mentioned, Rushmore" is and was, a Delaware limited liability company with headquarters in the state of New York and at all times herein mentioned was conducting ongoing business in the state of New Hampshire and claims an interest adverse to the right, title, and interests of Plaintiff in the Subject Property.

## STATEMENT OF FACTS

5. Plaintiff is the borrower/mortgagor of a mortgage that is secured by the Subject Property (the "Mortgage").

6. On or about April 08, 2016, the mortgage loan was originated by New Penn Financial, LLC for $251, 655.00 (*See Exhibit* A). New Penn Financial established a monthly P&I payment of $1,219.65 (*See Exhibit* A). Per closing documents escrow was set at $664.68 per month (*See Exhibit* B). Per closing details from the origination, $3,500 was collected at closing for escrow reserves (*See Exhibit* C).

7. New Penn established that Subject Property was not located in a flood zone.

8. New Penn had serviced the loan from April 08, 2016 until September 16, 2016 with no Flood Insurance requirement, per FEMA.

9. On September 16, 2016 the loan servicing rights were transferred to Rushmore

2

Servicing. Rushmore claimed that the property was in Flood Zone A at the time of transfer.

10. Rushmore did not have any FEMA reports that the property was in flood zone A. Regardless, Rushmore implemented a flood insurance policy that cost $1,956.48 per year. The total charges over a two-year period equaled $3,445.29 (*See Exhibit* D).

11. Rushmore purchased a flood insurance policy from Great American Insurance (Policy #12310600). Per a conversation with representative Janisa at Great American Insurance, no FEMA flood zone disclosure is required if Great American Insurance can broker for coverage. Great American Insurance received policy coverage from Southwest Insurance Corporation (Policy # GAF0013127). Southwest Insurance Corporation advised that the total policy cost for the two years was $1,979.88. Rushmore refused to cancel policy coverage even though FEMA flood zone proof did not exist. Even though this flood insurance policy was not required per FEMA, Rushmore still overcharged a net amount of $1,465.41.

12. Numerous requests were sent by Plaintiff to Defendant to cancel the flood insurance policy.

13. Per the disclosure from Rushmore, the property taxes were $7,860 per year and home owners insurance was listed at $821.18 per year (*See Exhibit* E).

14. On or about May 1, 2016, Plaintiff began paying the Mortgage payments while omitting the additional unnecessary and fraudulent flood insurance policy amount. As a result, Defendant began placing Plaintiff's mortgage payments into an unapplied suspense account instead of applying the payment towards the Mortgage's principal balance and interest. Payments fluctuated, and ranged from $1,884.33 to $2,254.27 (*See Exhibit* F). Defendant's actions gave the false impression that Plaintiff was failing to make monthly mortgage

payments, and caused the Mortgage to become delinquent. As a result of the non- applied payments being placed into suspense, the bookkeeping records became distorted and inaccurate as to how much Plaintiff had paid towards the Mortgage's principal balance.

15. Plaintiff sent numerous qualified written requests ("QWRs") to Rushmore demanding to see the total amounts paid into escrow versus the amounts paid out. Rushmore refused to provide the accounting report. Instead, they consistently send preposterous and ambiguous statements showing "projected" and "cushioned" escrow figures. Rushmore never disclosed "real" hard figures that proved the amount that was paid in and paid out.

16. The Subject Property was sold on June 13, 2018 and Rushmore was paid $243,385.10 based on the payoff demand they sent.

17. Per the payment history and disclosures sent by Rushmore, the total amount paid on the loan was $45,669.37. Adding in the initial $3500 escrow deposit, the total paid equals $49,169.37. The total principal + interest payments due from September 01, 2016 to June 01, 2018 equal $25,612.65 ($1,219.65 x 21). The total escrow equaled $13,948.41 ($664.68 x 21). Ultimately, the Plaintiff was overcharged $9,608.31 ($49,169.31 - $25,612.65 - $13,948.41).

18. The $9,608.31 over charge does not include the funds paid to New Penn Financial from April .08, 2016 to September 16, 2016. Even though Qualified Written Requests were sent demanding the amount paid to New Penn Financial, Rushmore refused to provide that information. The estimated escrow funds paid during that period equal $3,323.40. Therefore, the total overcharge equals $12,937.71.

19. Defendant's attempted to force-place an expensive and unnecessary flood insurance policy and misapply Plaintiff's payments towards the Mortgage because Defendant

4

receives commission kickbacks from these high premium force-placed polices. When Defendant is able to force insurance policies onto consumer loans with no challenge, their profits increase greatly whether the homeowners simply pay the demands or default on their loans.

20. Plaintiff has relocated to work for Google as a Project Engineer. The undue stress from the accounting distortion caused the client to miss work, and ultimately lose his job.

## COUNT I

*Violation of the Fair Debt Collection Practices Act (15 U.S.C. § 1692*

21. Paragraphs 1 through 20 are realleged as though fully set forth herein.

22. In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692-1692p, which became effective on March 20, 1978, and has been in force since that date. Under Section 814 of the FDCPA, 15 U.S.C. § 1692, a violation of the FDCPA is deemed an unfair or deceptive act or practice in violation of the FTC Act. Further, the Federal Trade Commission ("FTC') is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the FDCPA. The authority of the FTC in this regard includes the power to enforce the provisions of the FDCPA in the same manner as if the violations of the FDCPA were violations of a Federal Trade Commission trade regulation rule.

23. Plaintiff is a consumer within the meaning of the FDCPA, 15 U.S.C. §1692a(3) and suffered damages as a direct and proximate cause of Defendant's misconduct. He has suffered actual damages in an amount to be determined and special damages due to emotional distress. Plaintiff has relocated to work for Google as a Project Engineer. The undue stress from the accounting distortion caused the client to miss work, and ultimately lose

his job.

24. Defendant is a debt collector within the meaning of the FDCPA, 15 U.S.C. §1692a(6).

25. Defendant violated the FDCPA. Defendant's violations include, but are not limited to, the following:

A. Defendant violated 15 U.S.C. §1692d by engaging in conduct the natural consequence of which is to harass, oppress, or abuse any person. This violation is demonstrated by the following:

- Rushmore did not have any FEMA reports that the property was in flood zone A. Regardless, Rushmore implemented a flood insurance policy that cost $1,956.48 per year. The total charges over a two-year period equaled $3,445.29 (*See Exhibit* D).

- Rushmore purchased a flood insurance policy from Great American Insurance (Policy #12310600. Per a conversation with representative Janisa at Great American Insurance, no FEMA flood zone disclosure is required if Great American Insurance can broker for coverage. Great American Insurance received policy coverage from Southwest Insurance Corporation (Policy # GAF0013127). Southwest Insurance Corporation advised that the total policy cost for the two years was $1,979.88. Rushmore refused to cancel policy coverage even though FEMA flood zone proof did not exist. Even though this flood insurance policy was not required per FEMA, Rushmore still overcharged a net amount of $1,465.41.

- Numerous requests were sent by Plaintiff to Defendant to cancel the flood insurance policy yet Defendant would not cancel the policy.

- Per the disclosure from Rushmore, the property taxes were $7,860 per year and home owners insurance was listed at $821.18 per year (*See Exhibit* E).
- On or about May 1, 2016, Plaintiff began paying the Mortgage payments while omitting the additional unnecessary and fraudulent flood insurance policy amount. As a result, Defendant began placing Plaintiff's mortgage payments into an unapplied suspense account instead of applying the payment towards the Mortgage's principal balance and interest. Payments fluctuated, and ranged from $1,884.33 to $2,254.27 (*See Exhibit* F). Defendant's actions gave the false impression that Plaintiff was failing to make monthly mortgage payments, and caused the Mortgage to become delinquent. As a result of the non-applied payments being placed into suspense, the bookkeeping records became distorted and inaccurate as to how much Plaintiff had paid towards the Mortgage's principal balance.
- Plaintiff sent numerous QWRs to Rushmore demanding to see the total amounts paid into escrow versus the amounts paid out. Rushmore refused to provide the accounting report. Instead, they consistently send preposterous and ambiguous statements showing "projected" and "cushioned" escrow figures. Rushmore never disclosed "real" hard figures that proved the amount that was paid in and paid out.
- Per the payment history and disclosures sent by Rushmore, the total amount paid on the loan was $45,669.37. Adding in the initial $3500 escrow deposit, the total paid equals $49,169.37. The total principal + interest payments due from September 01, 2016 to June 01, 2018 equal $25,612.65 ($1,219.65 x 21). The total escrow equaled $13,948.41 ($664.68 x 21). Ultimately, the Plaintiff

    was overcharged $9,608.31 ($49,169.31 - $25,612.65 - $13,948.41).

- The $9,608.31 over charge does not include the funds paid to New Penn Financial from April .08, 2016 to September 16, 2016. Even though QWRs were sent demanding the amount paid to New Penn Financial, Rushmore refused to provide that information. The estimated escrow funds paid during that period equal $3,323.40. Therefore, the total overcharge equals $12,937.71.

B.   Defendant violated 15 U.S.C. §1692e(2) by falsely representing the character, amount, or legal status of any debt. This violation is demonstrated by the following:

- Rushmore did not have any FEMA reports that the property was in flood zone A. Regardless, Rushmore implemented a flood insurance policy that cost $1,956.48 per year. The total charges over a two-year period equaled $3,445.29 (*See Exhibit* D).

- Rushmore purchased a flood insurance policy from Great American Insurance (Policy #12310600. Per a conversation with representative Janisa at Great American Insurance, no FEMA flood zone disclosure is required if Great American Insurance can broker for coverage. Great American Insurance received policy coverage from Southwest Insurance Corporation (Policy # GAF0013127). Southwest Insurance Corporation advised that the total policy cost for the two years was $1,979.88. Rushmore refused to cancel policy coverage even though FEMA flood zone proof did not exist. Even though this flood insurance policy was not required per FEMA, Rushmore still overcharged a net amount of $1,465.41.

- Per the disclosure from Rushmore, the property taxes were $7,860 per year and

8

home owners insurance was listed at $821.18 per year (*See Exhibit* E).

- On or about May 1, 2016, Plaintiff began paying the Mortgage payments while omitting the additional unnecessary and fraudulent flood insurance policy amount. As a result, Defendant began placing Plaintiff's mortgage payments into an unapplied suspense account instead of applying the payment towards the Mortgage's principal balance and interest. Payments fluctuated, and ranged from $1,884.33 to $2,254.27 (*See Exhibit* F). Defendant's actions gave the false impression that Plaintiff was failing to make monthly mortgage payments, and caused the Mortgage to become delinquent. As a result of the non- applied payments being placed into suspense, the bookkeeping records became distorted and inaccurate as to how much Plaintiff had paid towards the Mortgage's principal balance.

- Plaintiff sent numerous QWRs to Rushmore demanding to see the total amount paid into escrow versus the amounts paid out. Rushmore refused to provide the accounting report. Instead, they consistently send preposterous and ambiguous statements showing "projected" and "cushioned" escrow figures. Rushmore never disclosed "real" hard figures that proved the amount that was paid in and paid out.

- Per the payment history and disclosures sent by Rushmore, the total amount paid on the loan was $45,669.37. Adding in the initial $3500 escrow deposit, the total paid equals $49,169.37. The total principal + interest payments due from September 01, 2016 to June 01, 2018 equal $25,612.65 ($1,219.65 x 21). The total escrow equaled $13,948.41 ($664.68 x 21). Ultimately, the Plaintiff was overcharged $9,608.31 ($49,169.31 - $25,612.65 - $13,948.41).

9

- The $9,608.31 over charge does not include the funds paid to New Penn Financial from April .08, 2016 to September 16, 2016. Even though QWRs were sent demanding the amount paid to New Penn Financial, Rushmore refused to provide that information. The estimated escrow funds paid during that period equal $3,323.40. Therefore, the total overcharge equals $12,937.71.

C. Defendant violated 15 U.S.C. §1692e(8) by communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

D. Defendant violated 15 U.S.C. §1692e(10) by the use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. This violation is demonstrated by the following:

- Rushmore did not have any FEMA reports that the property was in flood zone A. Regardless, Rushmore implemented a flood insurance policy that cost $1,956.48 per year. The total charges over a two-year period equaled $3,445.29 (*See Exhibit D*).

- Rushmore purchased a flood insurance policy from Great American Insurance (Policy #12310600. Per a conversation with representative Janisa at Great American Insurance, no FEMA flood zone disclosure is required if Great American Insurance can broker for coverage. Great American Insurance received policy coverage from Southwest Insurance Corporation (Policy # GAF0013127). Southwest Insurance Corporation advised that the total policy cost for the two years was $1,979.88. Rushmore refused to cancel policy coverage even though FEMA flood zone proof did not exist. Even though this flood insurance policy

was not required per FEMA, Rushmore still overcharged a net amount of $1,465.41.

- Per the disclosure from Rushmore, the property taxes were $7,860 per year and home owners insurance was listed at $821.18 per year (*See Exhibit* E).

- On or about May 1, 2016, Plaintiff began paying the Mortgage payments while omitting the additional unnecessary and fraudulent flood insurance policy amount. As a result, Defendant began placing Plaintiff's mortgage payments into an unapplied suspense account instead of applying the payment towards the Mortgage's principal balance and interest. Payments fluctuated, and ranged from $1,884.33 to $2,254.27 (*See Exhibit* F). Defendant's actions gave the false impression that Plaintiff was failing to make monthly mortgage payments, and caused the Mortgage to become delinquent. As a result of the non-applied payments being placed into suspense, the bookkeeping records became distorted and inaccurate as to how much Plaintiff had paid towards the Mortgage's principal balance.

- Plaintiff sent numerous QWRs to Rushmore demanding to see the total amounts paid into escrow versus the amounts paid out. Rushmore refused to provide the accounting report. Instead, they consistently send preposterous and ambiguous statements showing "projected" and "cushioned" escrow figures. Rushmore never disclosed "real" hard figures that proved the amount that was paid in and paid out.

- Per the payment history and disclosures sent by Rushmore, the total amount paid on the loan was $45,669.37. Adding in the initial $3500 escrow deposit, the total paid equals $49,169.37. The total principal + interest payments due from September 01, 2016 to June 01, 2018 equal $25,612.65 ($1,219.65 x 21). The

total escrow equaled $13,948.41 ($664.68 x 21). Ultimately, the Plaintiff was overcharged $9,608.31 ($49,169.31 - $25,612.65 - $13,948.41).

- The $9,608.31 over charge does not include the funds paid to New Penn Financial from April .08, 2016 to September 16, 2016. Even though QWRs were sent demanding the amount paid to New Penn Financial, Rushmore refused to provide that information. The estimated escrow funds paid during that period equal $3,323.40. Therefore, the total overcharge equals $12,937.71.

## COUNT II
### *Negligence*

26. Paragraphs 1 through 25 are realleged as though fully set forth herein.

27. Given Rushmore's role as a mortgage loan servicer, Rushmore's possession of the security instrument that provides Defendant with the ability to implement foreclosure proceedings on the Subject Property, and Rushmore's responsibility to manage the escrow payments associated with the Mortgage, Defendant owed Plaintiff a duty.

28. Rushmore breached its duty to Plaintiff by failing to apply payments made by Plaintiff towards the outstanding principal balance, causing an unwarranted and unnecessary delinquency. In May 1, 2016, Plaintiff began paying the Mortgage payments while omitting the additional unnecessary and fraudulent flood insurance policy amount. As a result, Defendant began placing Plaintiff's mortgage payments into an unapplied suspense account instead of applying the payment towards the Mortgage's principal balance and interest. Payments fluctuated, and ranged from $1,884.33 to $2,254.27 (See Exhibit F).

29. As a direct and proximate result of the negligence and carelessness of Defendant as set forth above, Plaintiff suffered, and continues to suffer, general, actual, and special damages in an amount to be determined at trial. Defendant's actions described in the aforementioned

paragraphs, (which include but are not limited to, force-placing insurance, engaging in deceptive practices, making misrepresentations to Plaintiff, and misapplying payments) have caused Plaintiff to suffer extreme emotional distress. Defendant has abused its rights as a lender and/or loan servicer, has engaged in unfair business practices, and has breached several promises as well as fiduciary duties owed to Plaintiff. Defendant's misconduct has caused the Mortgage to undergo improper delinquency and Plaintiff has been wrongfully assessed an improper balance, penalties, late charges, and other fees. As a result, Plaintiff has suffered improper credit reporting and harm to his credit score based upon an illegitimate delinquency. Plaintiff has also incurred court fees to enforce his legal rights, while suffering the slander of his reputation due to illegitimate negative credit reporting and late charges associated with his mortgage account.

## COUNT III
*Violation of The Consumer Protection Act Unfair Trade Practices Act (RSA 358-A)*

30. Paragraphs 1 through 29 are realleged as though fully set forth herein.

31. Per Regulation of Business Practices for Consumer Protection, also known as the Consumer Protection Act ("RSA 358-A"), an unfair method of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are prohibited and declared unlawful.

32. Defendant committed the following deceptive acts or practices in the conduct of trade and/or commerce in the following manner:

- Rushmore did not have any FEMA reports that the property was in flood zone A. Regardless, Rushmore implemented a flood insurance policy that cost $1,956.48 per year. The total charges over a two-year period equaled $3,445.29 (*See Exhibit* D).

- Rushmore did not have any FEMA reports that the property was in flood zone A. Regardless, Rushmore implemented a flood insurance policy that cost

13

$1,956.48 per year. The total charges over a two-year period equaled $3,445.29 (*See Exhibit* D).

- Rushmore purchased a flood insurance policy from Great American Insurance (Policy #12310600. Per a conversation with representative Janisa at Great American Insurance, no FEMA flood zone disclosure is required if Great American Insurance can broker for coverage. Great American Insurance received policy coverage from Southwest Insurance Corporation (Policy # GAF0013127). Southwest Insurance Corporation advised that the total policy cost for the two years was $1,979.88. Rushmore refused to cancel policy coverage even though FEMA flood zone proof did not exist. Even though this flood insurance policy was not required per FEMA, Rushmore still overcharged a net amount of $1,465.41.

- Numerous requests were sent by Plaintiff to Defendant to cancel the flood insurance policy yet Defendant would not cancel the policy.

- Per the disclosure from Rushmore, the property taxes were $7,860 per year and home owners insurance was listed at $821.18 per year (*See Exhibit* E).

- On or about May 1, 2016, Plaintiff began paying the Mortgage payments while omitting the additional unnecessary and fraudulent flood insurance policy amount. As a result, Defendant began placing Plaintiff's mortgage payments into an unapplied suspense account instead of applying the payment towards the Mortgage's principal balance and interest. Payments fluctuated, and ranged from $1,884.33 to $2,254.27 (*See Exhibit* F). Defendant's actions gave the false impression that Plaintiff was failing to make monthly mortgage payments, and caused the Mortgage to become delinquent. As a result of the

- non- applied payments being placed into suspense, the bookkeeping records became distorted and inaccurate as to how much Plaintiff had paid towards the Mortgage's principal balance.

- Plaintiff sent numerous QWRs to Rushmore demanding to see the total amounts paid into escrow versus the amounts paid out. Rushmore refused to provide the accounting report. Instead, they consistently send preposterous and ambiguous statements showing "projected" and "cushioned" escrow figures. Rushmore never disclosed "real" hard figures that proved the amount that was paid in and paid out.

- Per the payment history and disclosures sent by Rushmore, the total amount paid on the loan was $45,669.37. Adding in the initial $3500 escrow deposit, the total paid equals $49,169.37. The total principal + interest payments due from September 01, 2016 to June 01, 2018 equal $25,612.65 ($1,219.65 x 21). The total escrow equaled $13,948.41 ($664.68 x 21). Ultimately, the Plaintiff was overcharged $9,608.31 ($49,169.31 - $25,612.65 - $13,948.41).

- The $9,608.31 over charge does not include the funds paid to New Penn Financial from April .08, 2016 to September 16, 2016. Even though QWRs were sent demanding the amount paid to New Penn Financial, Rushmore refused to provide that information. The estimated escrow funds paid during that period equal $3,323.40. Therefore, the total overcharge equals $12,937.71.

34.     The Housing and Urban Development and FHA requires PMI charges to be stopped after 20% of the loan has been paid by the borrower.

35.     As a direct and proximate result of the negligence and carelessness of

De fendant as set forth above, Plaintiff suffered, and continues to suffer, general, actual, and special damages in an amount to be determined at trial. Defendant's actions described in the aforementioned paragraphs, (which include but are not limited to, force-placing insurance, engaging in deceptive practices, making misrepresentations to Plaintiff, and misapplying payments) have caused Plaintiff to suffer extreme emotional distress. Defendant has abused its rights as a lender and/or loan servicer, has engaged in unfair business practices, and has breached several promises as well as fiduciary duties owed to Plaintiff. Defendant's misconduct has caused the Mortgage to undergo improper delinquency and Plaintiff has been wrongfully assessed an improper balance, penalties, late charges, and other fees. As a result, Plaintiff has suffered improper credit reporting and harm to his credit score based upon an illegitimate delinquency. Plaintiff has also incurred court fees to enforce his legal rights, while suffering the slander of his reputation due to illegitimate negative credit reporting and late charges associated with his mortgage account.

### COUNT IV
*Violation of Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §2605*

36. Paragraphs 1 through 35 are realleged as though fully set forth herein.

37. Defendant Rushmore is a servicer of the Mortgage, a federally related mortgage loan within the meaning of RESPA, 12 U.S.C. §2605.

38. Rushmore is a debt collector under the meaning of 12 U.S.C. §2605.

39. Plaintiff sent numerous QWRs to Rushmore demanding to see the total amounts paid into escrow versus the amounts paid out. Rushmore refused to provide the accounting report. Instead, they consistently sent preposterous and ambiguous statements showing "projected" and "cushioned" escrow figures. Rushmore never disclosed "real" hard

figures that proved the amount that was paid in and paid out.

40. The qualified written request ("QWR") is an attempt to request the payment history and other servicing information associated with the Mortgage. Plaintiff's written communication included Plaintiffs' name, accounts number, and a provided sufficient detail to the servicer regarding information sought by the Plaintiff. The information sought by Plaintiff was clearly enumerated in detail so there was no confusion as to what Plaintiff sought. The correspondence specifically requested documentation relating "servicing" that would clarify the debt amounts owed, validate the debt owed by Plaintiff, and validate Rushmore's ability to collect the debt. The information sought related to the servicing because it concerned an accounting of the payments applied on the Mortgage. To date, Rushmore has neglected its servicing duties and failed to provide the requested documentation that would clarify the debt amounts owed, clarify previous payments applied to the Mortgage, validate the debt owed by Plaintiff, and validate Rushmore's ability to legally collect the debt.

41. Plaintiff's QWR made request to "clarify the debt amounts owed," which relate to the Mortgage's servicing documentation relating to an account history of all scheduled periodic payments made by Plaintiffs pursuant the terms of the Mortgage. Such request includes a summary of all principle and interest payments made by the Plaintiffs towards the Mortgage as was required pursuant the terms of the Loan. Plaintiff's QWR essentially sought a payment history of the Mortgage, a servicing request, in addition to a validation of Rushmore's ability to legally collect such payments made pursuant the Mortgage.

42. Plaintiff's QWR expressed Plaintiff's concern that the account associated with the Mortgage was in error and Plaintiff's QWR sought a payment history of the Mortgage.

43. Plaintiff's written requests for information about Plaintiff's account and requests for validation were "qualified written requests" within the meaning of RESPA.

44. Defendant deliberately failed to respond in a proper and timely way to Plaintiff's "qualified written requests" for information, in violation of 12 U.S.C. §2605(e).

45. Plaintiff suffered damages as a result of Rushmore's failure to respond to Plaintiff's qualified written requests for information because Plaintiff has been unsure of amounts legitimately owed on the Mortgage, causing Plaintiff to make unnecessary payments to Defendant. Plaintiff made numerous unnecessary mortgage payments as a result of not being knowledgeable of the true amounts owed. As a result of such payments, Defendant has been unjustly enriched while Plaintiff has incurred court fees to enforce his legal rights, while suffering the slander of his reputation due to illegitimate negative credit reporting and late charges associated with his mortgage account

46. WHEREFORE, Plaintiff demands judgment against Defendant for actual, statutory, treble and/or punitive damages, and the monetary equivalent of attorney's fees and costs, along with any other and further relief as the court deems just and proper, pursuant to 12 U.S.C. §2605.

## JURY TRIAL DEMANDED

47. Plaintiff demands a trial by jury on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests the following relief:

1. Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing.

2. An accounting of the amounts received by them or their agents and assigns which account for the alleged debt attributed to the Mortgage.

3. Award any actual, special, and/or statutory minimum damages;

4. Award punitive damages for Defendant's wanton and willful misconduct.

5. Award Plaintiff the costs of this action, including the fees and costs of experts, and the monetary equivalent of attorney's fees;

6. Order a judgment for Defendant to make corrections to negative credit reporting and late fees attributed to the mortgage account.

7. Grant Plaintiff such other and further relief as this Court finds necessary and proper.

Dated: January 25, 2019

Respectfully submitted,

Brian Beauregard
27 GH Carter Drive
Danville, NH 03819
(603) 347-5664
brianb12310@gmail.com

Plaintiff *Pro Se*